FILED

JUN - 6 2002

LARRY W. PROPES, CLERK
COLUMBIA, S.C.

Entered:
6·6·02

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
AIKEN DIVISION

| | | |
|---|---|---|
| WANDA M. BRYANT, | ) | C.A. No. 1:00-1224-22 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **ORDER ON DAMAGES** |
| | ) | |
| AIKEN REGIONAL MEDICAL | ) | |
| CENTERS, INC., | ) | |
| | ) | |
| Defendant. | ) | |


*cue #1*

This matter is before the court for post-trial review of damages awarded by the jury and for the court's determination of certain related damages issues. For the reasons set forth below, this court:

1. confirms its award of $40,000 in back pay damages;

2. rejects Defendant's challenge to the jury's assessment of $50,000 in compensatory damages for emotional distress injuries;

3. rejects Defendant's challenge to the propriety and amount of the punitive damages award ($210,000);

4. awards Plaintiff prejudgment interest based on South Carolina's statutory rate of interest 8.75% ($ 7,710.05 through June 4, 2002, plus $ 9.62 per day through the date of entry of judgment);

5. rejects Plaintiff's request for an enhancement to account for the income tax consequences of the lump-sum back pay award.

### Background

This matter came before the court for trial on March 18, 2002. Trial continued through March 20, 2002, at which time the jury returned a verdict on special interrogatories finding that Defendant had "denied [Plaintiff] a promotion to a registered nurse position because of racial

discrimination" and had declined to promote her "to surgical tech[nician] in April 1998 based on retaliation" for prior protected conduct. Verdict Form Questions 2 & 3; Supplemental Verdict Form. The jury awarded Plaintiff "compensatory damages for emotional pain, humiliation, and mental anguish in the amount of $50,000.00," and assessed punitive damages in the amount of $210,000. Verdict Form Questions 5 & 6. In addition, the jury provided an advisory verdict as to compensatory damages for lost wages and benefits in the amount of $40,000. After careful consideration of the evidence, this court adopted the advisory verdict on back pay as its own.

At the close of trial, Plaintiff moved for prejudgment interest and an enhancement to compensate Plaintiff for the tax consequences of receiving her back pay in a single lump-sum award. The court allowed further briefing on this and related damages issues. Those issues have now been fully briefed.

## Discussion

**1.  Back Pay Award – $40,000**

The evidence supporting an award of back pay in the amount of $40,000 was discussed in detail at the conclusion of the trial. *See* Tr. at 50-57. In fact, in order to insure that the court had a complete basis for properly calculating damages, the court presented the jury with a supplemental special verdict question and sent them back for further deliberations. *See* Tr. at 47-50 & 54.

Based on the calculations discussed in the above referenced pages of the transcript, this court first concluded that the jury's advisory verdict of $40,000 was supported by the record. It then determined, based on the same evidence and calculations, to adopt this verdict as its own. While Defendant points this court to other evidence which could have resulted in a lower back pay award, Defendant has not convinced this court that its earlier findings were incorrect or that the back pay award should be reduced. This court, therefore, reaffirms its finding that $40,000 is the proper

amount of back pay necessary to compensate Plaintiff for lost wages and benefits.

2.   **Compensatory Damages for Emotional Distress – $50,000**

The jury concluded that Defendant's first actionable conduct was its refusal to promote Plaintiff to a surgical technician position in April 1998, in retaliation for Plaintiff's prior protected activities. Despite the denial of promotion, Plaintiff continued to work for Defendant from that date until February 1999. During this time, Plaintiff obtained her degree and license as a Registered Nurse. During the late fall of 1998, Plaintiff began seeking a position as an RN to commence upon receipt of her degree (December 1998) and license (January 1999). Plaintiff left Defendant's employ in February 1999, after receiving little or no response to her attempts to obtain a position as an RN. The jury concluded that this lack of response and the resulting denial of a nursing position was based on race discrimination or retaliation or both.



Plaintiff testified that her emotional reaction to the discrimination and retaliation was to feel "embarrassed, frustrated, and angry." Tr. Vol. I at 155. She also testified that her resulting emotional distress manifested itself in the following physical symptoms: "frequent headaches, insomnia, irregular menstrual cycles, nausea, [and] vomiting." *Id.*

Based on this and other record evidence, the jury could reasonably have concluded that Plaintiff was placed in an emotionally trying situation which continued at least from mid April 1998 through the conclusion of her employment in early 1999. The jury could also reasonably have found that the distress was exacerbated by the various inconsistencies in Defendant's position. For example, there was substantial evidence that Plaintiff made multiple attempts to gain both types of position and that her attempts were met either with conflicting or deprecating responses.[1]

---

[1] Plaintiff testified, for instance, that when she complained to three different managers (John Morkavich, Ron Parks, and Sandy Garcia) regarding her failure to receive a promotion to a surgical

3

The jury could have reasonably concluded that these mixed or negative messages gave Plaintiff good cause to believe that Defendant would never allow her to advance, despite the fact that Defendant had advanced tuition money to Plaintiff under an agreement that required Plaintiff to repay the money if she did not remain in Defendant's employ. It was not until the very conclusion of Plaintiff's employment that Defendant affirmatively released Plaintiff from this obligation. Even then it did so based on an alleged inability to find a signed document, which could have caused Plaintiff to worry that Defendant might change its position if it later found a signed document.[2] The jury could, therefore, reasonably have concluded that Plaintiff was placed in a position for much of the last year of her employment with Defendant which left her feeling not only upset by the discrimination and retaliation but also trapped by the tuition agreement.

Plaintiff's distress was not, however, necessarily limited to the nearly ten month period of time between the first retaliation and her departure from Defendant's employ. Rather, the jury could quite reasonably have assumed that Plaintiff's distress continued into the subsequent months during which Plaintiff worked for other institutions as an RN for less than she would have received at Defendant's hospital.

---

technician position, they told her "that they did not want to hire me right then as a surgical technician because I was going to be graduating from nursing school in a few months and they were going to give me a job as an operating room nurse." Tr. Vol. I at 113. Nonetheless, Plaintiff's attempts to gain such a position were equally unsatisfactory. *See* Tr. Vol. I at 115-18, 126-34 & 186. Most particularly, when she spoke to nursing supervisor Ann Angle in January or February of 1999, to whom she was directed by Human Resources when she complained of the lack of response to her applications for a nursing position, Angle indicated that there was nothing wrong with Plaintiff staying in her current low paying, sub-surgical technician position despite receipt of a nursing degree. *See infra* at 8 (discussing comments of Ann Angle).

[2] Such a fear would not be wholly unreasonable as Defendant has, in documents filed with this court, suggested that Plaintiff tried to evade her obligations under this agreement when the evidence is to the contrary: that Plaintiff brought the obligation to Defendant's attention.

4

In short, while Plaintiff may not have demonstrated that her emotional distress rose to such a level that she sought medical attention, the duration of the period for which the jury could reasonably find distress and Plaintiff's testimony regarding her emotional and physical reactions to the distress support the amount of the award. *See Johnson v. Hugo's Skateway,* 974 F.2d 1408 (4th Cir. 1992) (upholding an award of $25,000 in compensatory damages for emotional distress for a single incident occurring over the course of one evening).³ Further, as to the issue of medical attention, Plaintiff was herself a medical professional whose opinion as to her own condition the jury was entitled to consider. Thus, this court concludes that Plaintiff's testimony as to the extent and form of her emotional distress injuries was "demonstrable, genuine, and adequately explained." *Price v. City of Charlotte*, 93 F.3d 1241, 1252 (4th Cir. 1996).

For these reasons, this court concludes that the jury's award of compensatory damages in the amount of $50,000.00 for emotional distress was supported by the evidence.

---

³ The defendants in *Johnson* included both a skating rink (Hugo's) and a deputy sheriff. Hugo's was held liable for harassing plaintiff due to his race. The deputy was held liable for excessive force in arresting plaintiff when called by Hugo's. The deputy was not, however, held to have committed any race based tort. The jury awarded $200 against the deputy for his actions and $25,000 against Hugo's. Hugo's challenged the award based, in part, on the disparity of the amounts awarded relative to the actions of the two defendants.

The specific actions which Hugo's directed towards plaintiff consisted of a manager asking plaintiff, the only African-American in the rink, to accompany the manager to a back room and then calling the sheriff to remove plaintiff when he refused to accompany the manager to the back room. During the intervening thirty minutes, plaintiff sat in front of the manager's office. As the court directed a verdict against plaintiff on any false arrest or false imprisonment claim, these are the sole actions from which any injuries chargeable to Hugo's rink could have flowed.

The only specific evidence of the emotional harm discussed in the appellate opinion is plaintiff's testimony that the request from the manager, who was described as "elderly," made plaintiff feel threatened and intimidated. The Fourth Circuit concluded that: "Because of the difficulty in measuring the amount appropriate to compensate for the emotional injuries resulting from these sorts of wrongs and the rational basis for distinguishing between the harm caused by [the deputy] and that caused by Hugo's, we cannot conclude that the award against Hugo's was excessive." 944 F.2d at 1414.

5

3.  **Punitive Damages – $210,000**

Defendant's challenges to the punitive damages award fall into two categories. First, Defendant challenges the adequacy of the evidence to support the award of punitive damages under Title VII's statutory language and interpretative case law. Second, Defendant challenges the amount of the award under constitutional due process standards. This court has, therefore, conducted a careful review of the punitive damage award in both respects. *See Cooper Industries v. Leatherman Tool Group*, 532 U.S. 424 (2002) (directing appellate courts to conduct de novo review of trial court awards of punitive damages where constitutional challenges are raised and reaffirming standards established in *BMW of North America, Inc. v. Gore*, 517 U.S. 559 (1996) for trial court's review of punitive damages awards).

This court gave the jury a full instruction on the standards the jury should apply and factors they should consider in deciding whether to award punitive damages, including: whether a management official personally acted with malice or reckless indifference to Plaintiff's federally protected rights; and whether Defendant made good faith efforts to comply with the law. *See* Defendant's memorandum filed April 3, 2002 at 7-9 (quoting Tr. Vol. III at 21-23). There was no objection made to this charge at the time or now, beyond Defendant's argument that the issue should not have been submitted to the jury and, thus, no charge given. Rather, Defendant challenges the adequacy of the evidence to support findings against it under the standards as charged.

Defendant first argues that the evidence is insufficient to support a finding of malice or reckless indifference. *See Kolstad v. American Dental Ass'n*, 527 U.S. 526, 535 (1999) (these terms refer to "the employer's knowledge that it may be acting in violation of federal law"). Defendant's argument on this point merges with its second argument as both are based on the existence and dissemination of Defendant's written policy against discrimination. *See Kolstad*, 527 U.S. at 545

6

(punitive damages are not appropriate against the employer where the discriminatory action was "contrary to the employer's good-faith efforts to comply with Title VII").

The evidence is, however, more than sufficient to support the conclusion that any written policy was not implemented in good faith and that the discriminatory and retaliatory actions directed towards Plaintiff were sufficiently widespread among multiple persons with managerial and administrative responsibilities to treat those acts as the intentional actions of the employer. *See Harris v. L & L Wings, Inc.*, 132 F.3d 978 (4th Cir. 1997) (finding supervisors' repeated failure to address plaintiffs' concerns was evidence of employer's indifference to plaintiffs federally protected rights). Much of this evidence is addressed in Plaintiff's memorandum, as well as this court's order on Defendant's motion for summary judgment, and will not be fully repeated here. This court will, however, point to a few specific areas of supporting evidence.

First, Plaintiff's testimony regarding her difficulties in gaining the positions at issue involved a number of management level employees including Richard Lowe, the person who was responsible for enforcement of the policy during the relevant period.[4] As discussed below, the direct actions of Lowe himself, as reported by Plaintiff, could be interpreted as showing reckless indifference or actual malice, including evidence sufficient to support the conclusion that Lowe was involved in a concerted effort to deny Plaintiff any advancement opportunities and to encourage her to leave Defendant's employ. Given the jury concluded that Plaintiff was denied the promotions for racially discriminatory or retaliatory reasons, it follows that the jury could reasonably have concluded that any concerted effort was so motivated..

Plaintiff testified that she spoke with Lowe and other individuals in the Human Resources

---

[4] Lowe was the Director of Human Resources at the time Plaintiff resigned. Tr. Vol. I at 118.

7

Department four and six times regarding her difficulties obtaining responses to her applications for an RN position.[5] Tr. Vol. I at 126. When Plaintiff first went to Lowe regarding her difficulties receiving responses to her applications for a nursing position, and her concerns regarding her obligations under an agreement under which tuition money was advanced to aid her in completing her nursing degree, Lowe referred Plaintiff to another individual named Mary Ann Angle who was, apparently, in charge of nurse hiring. Tr. Vol. I at 119. It required three contacts with Angle before Angle would sit down with Plaintiff to discuss Plaintiff's concerns. Tr. Vol. I at 128. It was at that point that Angle told Plaintiff she saw no problem with Plaintiff continuing in a central services position despite the fact that Plaintiff had, by this time, acquired a nursing degree and license. Tr. Vol. I at 128-29. Such a comment might reasonably be taken as an indication that Defendant had no intention of allowing Plaintiff to advance.

By this point in time, Plaintiff's immediate supervisor had given Plaintiff an unsolicited glowing letter of recommendation. Tr. Vol. I at 134-35. Plaintiff also testified that this same supervisor had been critical of her performance, to the point of being "nitpicking," ever since Plaintiff voiced complaints about the racial composition of the surgical technician class. This change in attitude and the unsolicited nature of the letter of recommendation is subject to widely divergent interpretations. One reasonable interpretation, particularly when combined with the other evidence addressed above, is that Defendant wanted to encourage Plaintiff to leave because it viewed her as undesirable or a trouble maker. This is in part because there would have been no need for

---

[5] Plaintiff testified that she applied for four different nursing positions and received only one interview. Tr. Vol. I at 131. The hiring nurse did not attend that interview, but sent two other nurses who indicated that the hiring nurse would be back in touch with Plaintiff. Tr. Vol. I at 132. Plaintiff never received any subsequent contact from the hiring nurse. *Id.* Another nurse manager also promised to contact Plaintiff regarding the availability of a different nursing position but, likewise, failed to follow up. Tr. Vol. I at 133-34.

8

such a letter to support Plaintiff's promotion within Defendant's employ given Defendant's internal hiring and promotion procedures.

After meeting with Angle, Plaintiff determined that she would likely need to seek employment elsewhere. She returned to Lowe to advise him of Angle's comments and to again discuss her obligations under the tuition agreement. Tr. Vol. I. at 129. Lowe, apparently, did not indicate any concern with Angle's comments. Lowe did not immediately address the tuition agreement as he was not familiar with it. He subsequently sent Plaintiff a letter stating that Plaintiff was not obligated under the tuition agreement because it had not been signed by anyone in the hospital. *Id.* In the interim, Plaintiff had submitted her letter of resignation giving two weeks notice.

The actions of Lowe and the Human Resources Department also raise concerns because, according to Plaintiff, no one in that department ever advised Plaintiff of any concerns with the form or timing of her applications, or any of the other matters on which Defendant relied at trial. Tr. Vol. I at 119 & 126-27(Plaintiff on direct). Defendant, however, sought to defend its failure to offer Plaintiff any position (or to respond to her applications) by suggesting that the applications were submitted improperly, too early, or not at all. *E.g.,* Tr. Vol. I at 168-69 (Plaintiff cross-examination).

The jury concluded that Plaintiff did not receive the nursing positions for which she applied either due to racial discrimination or retaliation or both. Given the record as to Lowe's and other managers' involvement, the jury could well have concluded that the employer, through its various managers, was not only not implementing a nondiscrimination policy in good faith, but was actively discriminating in a concerted, widespread manner, despite the existence of a written policy.

There is a similar record to support the conclusion that multiple management level employees were involved in earlier denials of Plaintiff's attempt to advance to a surgical technician

9

position. Plaintiff testified that, in or before April 1998, she spoke with both her direct supervisor, John Morkavich, and Thomas Kelly, the Service Excellence Coordinator, regarding the lack of response to her prior applications for a surgical technician position, suggesting that she felt the only difference between herself and the person she knew who had received such a position was their race. Tr. Vol. I at 106-07. At that time, according to Plaintiff, Kelly advised Plaintiff that addressing race discrimination complaints was part of his job. Tr. Vol. I at 108. Despite these conversations, Plaintiff received no direct response to her April 1998 application for a surgical technician position. Plaintiff also testified that the work atmosphere became hostile and "nitpicking" thereafter. Tr. Vol. I at 109.

Plaintiff also testified that she complained to Morkavich, Ron Parks, and Sandy Garcia (who was in charge of the surgical technicians), regarding the lack of African Americans in the surgical technician training program, which comment apparently included a statement of concern that Plaintiff personally had been denied an opportunity for promotion to surgical technician. Tr. Vol. I at 112. The response Plaintiff was given by one or more of these individuals was that they did not want to promote Plaintiff to Surgical Technician at that time because they intended to hire her as a surgical nurse when she completed her nursing training in the next few months. *Supra* note 1.

While not all of the above referenced persons may have been involved in the final decisions to deny the relevant promotions, a reasonable inference can be drawn from the evidence that a number of these individuals took actions which contributed to Plaintiff's loss of opportunity to obtain the promotions, and, at the least, that they acted with complete indifference towards her concerns. In fact, it is clear that the jury concluded Plaintiff was denied the promotion she sought through her April 1998 application in retaliation for her complaints of racial discrimination.

In short, the inferences to be drawn from the evidence suggest sufficiently widespread

problems that the jury could have concluded that any written policy was not implemented in good faith. They may also have concluded that the managers to whom Plaintiff turned for assistance were, at the least, recklessly indifferent to her concerns and, quite possibly, in active concert in denying her any opportunity for advancement. Thus, there is evidence of malice and reckless indifference to Plaintiff's federally protected rights which is chargeable to the employer. Under these circumstances, this court finds the punitive damage award to be well supported by the evidence.

In light of this evidence, it is also clear that the award does not offend due process. *See Leatherman*, 532 U.S. 424, 440 (2002) (reaffirming use of three *Gore* factors in reviewing punitive damage award: (1) reprehensibility of the wrongful conduct; (2) reasonable ratio of compensatory to punitive damages; and (3) comparability of other awards). First, as discussed above, there is evidence of widespread and even collaborative efforts to deny Plaintiff's federally protected rights. Such behavior is clearly reprehensible. Second, the ratio of compensatory damages to punitive damages is clearly reasonable (a little more than two to one). Finally, given that the award is well below the statutory cap on such damages, this court does not find the comparability factor to raise a concern. *See Harris*, 132 F.3d 978 (affirming punitive damage award of $150,000 each to two plaintiffs who were harassed over a period of time).

4. **Prejudgment Interest – $7, 710.05 through June 4, 2002**

The award of prejudgment interest has generally been accepted as a proper means of insuring that back pay awards fully compensate plaintiffs who advance successful claims under Title VII. *See Loeffler v. Frank*, 486 U.S. 549, 557-58 (1988) ("apparently all of the United States Courts of Appeals that have considered the question agree, that Title VII authorizes prejudgment interest as part of the backpay remedy in suits against private employers. This conclusion surely is correct."). Under Fourth Circuit precedent, whether or not to award interest is within the discretion of the trial

11

court. *Maksymchuk v. Frank,* 987 F.2d 1072, 1077 (4th Cir. 1993) (noting courts should be guided in the exercise of that discretion by the goal of making plaintiffs whole for their losses).

The district court is also given broad discretion as to the rate to use in calculating prejudgment interest because there is no prescribed federal rate. *EEOC v. Liggett & Myers, Inc.,* 690 F.2d 1072, 1074 (4th Cir. 1982). Both the Fourth Circuit and other judges within this district have relied on the state statutory rate as a valid rate for prejudgment interest in actions involving federal claims. *See Liggett & Meyers,* 609 F.2d at 1074 (approving rate of prejudgment interest set by state statute); *Sadighi v. Daghighfekr,* 66 F. Supp. 2d 752, 765 (D.S.C. 1999) (applying rate set by S.C. Code Ann. § 34-31-20(A) in action involving both state and federal claims).

Defendant's only proffered argument against an award of prejudgment interest is based on an Eighth Circuit case which upheld the district court's denial of prejudgment interest based on the fact that plaintiff had also received a generous front-pay award. *See MacDissi v. Valmont Indus. Inc.,* 856 F.2d 1054, 1061 (8th Cir. 1988). This does little to instruct this court as to how it should exercise it's discretion in a case when there is no front-pay award. Moreover, Defendant's argument strikes this court as inconsistent with the guidance given in *Maksymchuk,* including as to the limited circumstances under which back pay is generally denied. *See Maksymchuk,* 987 F.2d at 1077 ("Prejudgment interest is commonly denied when the back pay award is not readily determinable or when the plaintiff fails to raise the issue in a timely or in an appropriate manner").

This court concludes that prejudgment interest is necessary in the present case to make Plaintiff whole for her losses. It further concludes that interest should be at the state's statutory rate of 8.75 %. *See* S.C. Code Ann. § 34-31-20(A). This court, therefore, awards Plaintiff prejudgment interest of 8.75 % ($7,710.05 through June 4, 2002, plus $9.62 per day through the date of entry of judgment).

5. **Enhancement of Award for Income Tax Consequences**

Plaintiff also argues for an enhancement to compensate her for the tax consequences of receiving her back pay in a lump-sum award. While Plaintiff cites some supporting authority, it does not appear that the Fourth Circuit has yet approved use of such an enhancement. Further, in the present case, Plaintiff has received both significant emotional distress and punitive damages awards which provide additional damages beyond the back pay award. Under these circumstances, this court is not inclined to apply what is a novel theory in this circuit to enhance the back pay award.

## CONCLUSION

For the reasons set forth above, this court confirms its initial award of back pay in the amount of $40,000.00, and awards prejudgment interest in the amount of $7,710.05 through June 4, 2002, plus $9.62 per day through the date of entry of judgment. The court declines to further enhance the back pay award to compensate for tax consequences of receipt of the award in a lump-sum. The court further finds the jury's awards of $50,000.00 in compensatory damages for emotional distress as well as $210,000.00 in punitive damages to be well supported by the evidence and law. Judgment shall be entered accordingly.

IT IS SO ORDERED.

*Cameron McGowan Currie*
CAMERON MCGOWAN CURRIE
UNITED STATES DISTRICT JUDGE

Columbia, South Carolina
June 5, 2002

O:\Civil Orders\Employment\00-1224-post trial order -- damages.wpd

AO 72A
(Rev.8/82)